UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

XSTRATA CANADA CORP.,

        Plaintiff,

-against-                                         1:09-cv-1250 (LEK/DRH)

MARK MAURIELLO, *et al.*,

        Defendants.

_____

# MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

This matter comes before the Court on Defendant Mark Mauriello's ("Defendant") Motion for costs, disbursements, and attorney's fees against Plaintiff Xstrata Canada Corporation ("Plaintiff" or "Xstrata") and Plaintiff's counsel, Freeborn & Peters, LLP, pursuant to 28 U.S.C. § 1927, Federal Rule of Civil Procedure 54, and the Court's inherent power to award such costs and fees. Dkt. Nos. 74 ("Motion"); 74-14 ("Memorandum"). Plaintiff filed a Response. Dkt. No. 76 ("Response"). For the reasons discussed below, Defendant's Motion is denied.

**II.    BACKGROUND**

    **A. Factual History**

During the 19th century and up until the mid-to-late 1960s, Gorham Manufacturing Company ("Gorham") produced fine flatware, silverware, and other precious metal objects at their facility in Providence, Rhode Island. Dkt. No. 74-7 ¶ 1 ("Plaintiff's Response SMF"). Gorham's manufacturing process created a waste byproduct called "slag." Id. Gorham repeatedly buried this slag in a landfill in the rear premises of its manufacturing facility. Id. ¶ 2. This process continued until Textron bought Gorham in 1967. Id. On March 29, 2006, Rhode Island Superior Court Judge

Procaccini issued an Order of Consent mandating that the buried slag located at the former Gorham premises be excavated because it was officially deemed an environmental hazard. Id. ¶ 4. In response to the Consent Order, Textron hired Clean Harbor Environmental Services, Inc. ("Clean Harbor") to remove the slag from the affected area. Id. ¶ 6.

On or about May 10, 2006, Stephen McDougall ("McDougall") of Clean Harbor contacted Defendant Thomas Delia ("Delia")—a principal of Advanced Recycling Technology, Inc. ("ART"), which is a precious metal waste recycling company with an office in Hudson, New York—about the removal of the slag material on the premises. Id. ¶ 6. Delia responded the next day expressing his interest in the slag project and requesting that McDougall send him any "total metals" analysis that Clean Harbors had; on May 12, 2006, McDougall sent Delia all of the information that Clean Harbors had in its possession. Id. Moreover, around May 22, 2006, Delia and Defendant, a co-principal of ART, met Chris Kaihler and James DeWolf, both associates of Clean Harbor, at the Gorham site in Providence, Rhode Island. Mauriello recounted the visit:

> We walked around the site. We looked at the slag which was—there was a place where the slag was just on the surface, you could see that the rest of it looked like it was still in the ground, and visually observed it and any pieces or material that was readily available, I know Tom collected some of that so that we could do some independent— the company could do some independent testing.

Pl.'s Resp. SMF ¶ 10. On May 24, 2006, Delia drove to Philadelphia, PA and delivered to Abington Metals 38.5 pounds of the 80 pounds of slag, which he had collected at the Gorham site. Id. ¶ 15. Moreover, it was this "cherry-picked sample" that was then used to create an assay, which was used to induce Plaintiff's entry into contract negotiations with ART to take delivery of the slag. Id. ¶ 16. Another sample of this slag material prepared by Abington was then sent to Ledoux & Company by ART for additional analysis "by semi-quantitative X-Ray scan and by fire assay." Id.

¶ 17. On May 31, 2006, Ledoux performed an X-Ray scan on the Abington sample. Id. ¶ 20. On June 13, 2006, Delia sent the assay results via email to Ian Parkinson, a sales representative for Xstrata, and a correspondence began regarding details of the metal slag material. Id. ¶ 23. In or around August of 2006, Xstrata agreed with ART to process the Gorham material at its smelter in New Brunswick Canada and "pay for [the] gold and silver recovered therefrom pursuant to agreed upon terms." Dkt. No. 1 ("Complaint") ¶ 21.

During the middle of November, Delia and Mauriello "shipped a small quantity of the Gorham material to Xstrata by trucks known as 'B-Trains,'" and both Xstrata and ART performed assays of the B-Train material. Id. ¶ 22. Thereafter, ART delivered nearly 2000 tons of the Gorham material to Xstrata via three shipments between December 2006 and February 2007. Id. ¶ 23. Xstrata paid ART $1,170,477 in accordance with their agreement. Id. ¶ 24.

As a result of the foregoing, Xstrata filed a complaint against ART in late December of 2008, alleging that "ART breached the contract and misrepresented the quantity of metals contained in the slag and sought damages totaling $1.5 million." Xstrata Canada Corp. v. Advanced Recycling Tech., Inc., No. 08-CV-1366, Dkt. No. 1 (N.D.N.Y. filed on Dec. 23, 2008). In January of 2010, ART notified Xstrata that "it would not be defending the action, and accordingly, Xstrata moved for a default judgment; the motion was granted, and a judgment against ART in favor of Xstrata for $1.5 million was entered on April 19, 2010." Id. When Xstrata sought to collect its judgment, ART filed for bankruptcy in the Southern District of New York and was found to be insolvent. Id.

In 2009, Plaintiff commenced this lawsuit alleging fraudulent misrepresentations against Defendants in an effort to collect upon their judgment against ART, because both Defendants were

co-principals of the company. Dkt. No. 76 at 5. Shortly thereafter, Delia filed for bankruptcy in the Southern District of New York; this bankruptcy action consequently prevented Plaintiff from pursuing its claims against him in the Northern District of New York. Id. at 6. Defendant did, however, answer Plaintiff's complaint despite Delia's non-response. Id.

On November 19, 2013, the Court dismissed the case and entered judgment in favor of the Defendants; this dismissal occurred as a result of Plaintiff's Rule 41(a)(1) Motion for dismissal with prejudice. Dkt. No. 72 at 1. In response to the Court's order, Plaintiff filed a Motion to reconsider and/or amend the judgment dismissing the case against Defendants. Dkt. No. 73 at 4. Plaintiff stated it "no longer wishe[d] to pursue claims against Mauriello" and accordingly moved to dismiss its claim against Mauriello without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). Id. This motion was denied. Dkt. No. 75 at 2.

### III. LEGAL STANDARD

#### A. Award of Attorney's Fees & Court's Inherent Authority

The so-called "American Rule" is the background against which all discussion of shifting the burden of attorney's fees must be considered: "in the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Oliveri v. Thompson, 803 F.2d 1265, 1271 (2d Cir. 1986) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc., 421 U.S. 240, 247 (1975)). The Second Circuit has noted that "as an exception to the American Rule, the inherent power of the court allows the court to award reasonable attorneys' fees to the prevailing party when the opposing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Center Cadillac, Inc. v. Bank of Leumi Trust Co. of N.Y., 878 F. Supp. 626, 628 (2d Cir. 1995) (quoting Oliveri, 803 F.2d at 1272); see also United States v. Int'l Bhd. of Teamsters, 948

F.2d 1338, 1345 (2d Cir. 1991). The Court also notes that "awards under the inherent power exception to the American Rule may be made against the losing party or against the attorney for the losing party." Id.; see also, e.g., Dow Chem. Pac. Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (1986). In Roadway Express Inc. v. Piper, the Supreme Court stated that "because the inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." 447 U.S.752, 764 (1980). "[T]here are ample grounds for recognizing, however, that in narrowly defined circumstances federal courts have inherent power to assess attorney's [fees] against counsel." Id.

Attorney's fees may also be awarded under 28 U.S.C. § 1927, which reads:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Awards of attorney's fees under 28 U.S.C. § 1927 "must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power." Center Cadillac, 878 F. Supp. at 628 (quoting Oliveri, 803 F.2d at 1273). In considering whether there has been "bad faith," courts may consider the manner in which the action was brought and the manner in which it was litigated. Center Cadillac, 878 F. Supp. at 628 (citing Oliveri, 803 F.2d at 1272). Additionally, the "imposition of a sanction under § 1927 requires a 'clear showing of bad faith.'" Oliveri, 803 F.2d at 1273; see also Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1010 (2d Cir. 1986). The Second Circuit also requires that there be a showing of "clear evidence" that the opposing party's actions were to harass, delay the proceedings, or for otherwise inappropriate reasons. Center Cadillac, Inc., 878 F. Supp at 628 (citing Dow Chem. Pac. Ltd., 782 F. 2d at 344). Attorneys actions sufficient to

5

meet the "bad faith" test include:

> resubmitting a motion that had been previously found by the court, making several insupportable bias recusal motions and repeated motions to reargue, continually engaging in obfuscation of the issues, hyperbolism and groundless presumptions in addition to insinuating that the court was biased; and waiting until the eve of trial before making a jury demand.

Keller v. Mobil Corp., 55 F.3d 94, 99 (2d Cir. 1995) (quoting Hudson Motors P'ship v. Crest Leasing Enter., 845 F. Supp. 969, 978 (E.D.N.Y. 1994)).

Actions are "sanctionable under § 1927 only if they are 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" Keller, 55 F.3d at 99 (quoting Oliveri, 803 F.2d at 1273); see also Int'l Bhd. of Teamsters, 948 F.2d at 1345 ("Bad faith is the touchstone of an award under this statute."); Cruz v. Savage, 896 F.2d 626, 632 (1st Cir. 1990) ("Behavior is 'vexatious' when it is harassing or annoying regardless of whether it is intended to be so."). "A claim is 'colorable' for the purpose of awarding fees 'when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim. The questions is whether a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts actually had been established. " Republic of Rwanda v. Ferone, 2008 WL 919639, at *1 (quoting Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980)).

### B. Intentional Misrepresentation & Fraud[1]

In order to establish a claim for fraud in the inducement under New York law, a plaintiff must show that the defendant knowingly made a false representation of a material fact, and that

---

[1] The Court states the substantive standard for evaluating a claim for fraudulent misrepresentations because that is the claim in the underlying litigation that Defendant alleges was uncolorable and vexatious. See Mem. at 1-2.

6

there was detrimental reliance thereon. Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 490 (2d Cir. 1998). The false representation can be either a misrepresentation or the material omission of a fact. Id. Additionally, a party's reliance on an alleged misrepresentation must be reasonable. Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1484 (2d Cir. 1995). In assessing whether a party's reliance is reasonable, "the entire context of the transaction is considered, including such factors as its complexity and magnitude, the sophistication of the parties, and the contents of any agreements between them." Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003).

## IV. DISCUSSION

Defendant alleges that he is entitled to costs, litigation expenses, and attorney's fees because Plaintiff and its counsel have engaged in "bad faith, vexatious, wanton, and oppressive conduct and abusive litigation practices." Motemat 2. Defendant further alleges that Plaintiff's counsel "engaged in a repeated pattern of bad faith and unreasonable, vexatious litigation wholly and completely lacking in merit and lacking in legal basis." Id. at 6. Defendant asserts that the "bad-faith and vexatious conduct began at the early stages of this litigation when they drafted, filed, and served pleadings that twisted the facts and knowingly distorted the truth and disregarded their own client's evidence." Id. Defendant claims that "the proof adduced at the depositions coupled with the admissions of Xstrata's own employees, confirm that this case was brought by Xstrata to justify its own failure to exercise prudent business judgment, and properly follow its own procedures and place blame . . . on ART's shareholders." Id.

At the time Xstrata commenced this action, its claim that Mauriello was involved in the putative fraud was based on a reasonable belief due to Defendant's close relationship with ART and

7

Delia, his shareholder stake in the company, and Mauriello's communications, including emails, letters, and invoices, with Xstrata regarding the allegedly fraudulent transaction. See, e.g., Compl. ¶¶ 27, 29-30. Defendant repeatedly points to his lack of fraudulent involvement as evidence of Xstrata's bad faith, and asserts that the purpose behind Xstrata's action was "to justify [Xstrata's] own failures and place blame, through unfounded and unsubstantiated claims of fraud, on ART shareholders." Dkt. No. 74-1 ("Mauriello Affidavit") ¶ 13. Significantly, nowhere in Defendant's Affidavit nor in his Memorandum does he cite to any record evidence that Plaintiff possessed a "bad faith, vexatious, or oppressive reason" for bringing about this cause action. The bad faith standard is a high burden, and it has not been shown in this case.

Additionally, to the extent Defendant argues that facts developed in discovery revealed Plaintiff's claim to be uncolorable at some later point, that argument is belied by the deposition testimony that Defendant attached to his Motion. Significantly, no deposition to which Defendant refers establishes Plaintiff's prior knowledge of Defendant's non-involvement with "cherry-picking" the slag sample. Although it may be arguable that the deposition testimony of key party witnesses involved with the slag material and its processing presented suggested that Defendant might not have been involved, there remained a question of fact as to whether Defendant was at the Gorham when the slag sample was first collected and therefore was substantially involved in the putative fraud. Indeed, even Defendant himself stated at his deposition that he was present at the slag site when Delia collected the slag sample. Dkt. No. 77-1 ("Mauriello Deposition") at 32:14-34:7. Furthermore, there is evidence in the record that ART was aware that Metallix, a company that analyzes the presence of trace metals, ran four analyses of the slag sample, two of which yielded no payable gold, a third of which yielded a .0041% gold sample, and the fourth of which yielded a

8

.0051% gold sample. See, e.g., Dkt. No. 52-2, Ex. 11 at 76:18-78:20. However, witnesses testify that Xstrata received assurances from ART that samples lacking trace gold were not representative. See Dkt. No. 52-2, Exs. 7-8 at 258:19-259:24. Mauriello then invoiced Xstrata based upon the highest of the gold amounts, even though an inference existed that ART was aware that that assessment was not representative. Dkt. No. 52-6, Exs. 30-34 ("Invoices"). So, even after discovery, it was still reasonable for Plaintiffs to believe that Mauriello could have been involved in a putative fraud, and accordingly their claim was still colorable.

In light of these uncertain facts, Defendant has not met the substantial burden imposed by § 1927 or Federal Rule of Civil Procedure 54, and the Motion is therefore denied.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant Mark Mauriello's Motion (Dkt. No. 74) for attorney's fees and other costs is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:   September 30, 2014
         Albany, New York

Lawrence E. Kahn
U.S. District Judge